**Ernest Ohlmeyer, Appellee, v. American Steel & Wire Company of New Jersey, Appellant.**

### Gen. No. 5601.

1. PLEADING—*what defense available under a general issue.* Release may be shown under the general issue.

2. RELEASE—*what essential to avoid at law.* In an action at law a release cannot be avoided except by proving fraud in securing its execution, such as misreading it to the party signing it, or the surreptitious substitution of one paper for another or some trick or fraud in procuring the signature, or where it is represented to a signer who is unable to read that the paper is of some other character or for some other purpose.

Action in case for personal injuries. Appeal from the Circuit Court of Will county; the Hon. CHARLES B. CAMPBELL, Judge, presiding. Heard in this court at the October term, 1911. Reversed. Opinion filed March 13, 1912.

SNAPP & HEISE and JOHN R. COCHRAN, for appellant; KNAPP & CAMPBELL, of counsel.

E. C. HALL, for appellee.

MR. PRESIDING JUSTICE DIBELL delivered the opinion of the court.

The American Steel and Wire Company of New Jersey, appellant, operates a wire mill at Rockdale near Joliet. In a certain department of the mill wires are run from reels through a covered receptacle or tank containing a certain liquid, and then through other liquid in another tank where it is galvanized, and then through another tank where it passes through hot water. Ernest Ohlmeyer, appellee, was employed in the same room as a scrap gatherer. The men who take care of the wire while it is passing through these tanks are called "reelers". It was customary, when there was a vacancy in the position of reeler, to promote a scrap gatherer to that position, as the reeler received a little better pay, and the scrap gatherer, having worked in the same room, would have seen how the duties of reeler were performed. On March 5, 1909, appellee came to that department to perform a night's work as scrap gatherer, and, one reeler being absent, he was put into the position of reeler. During the night he had occasion to put his right hand into the electro-galvanizing solution through which the wires were being drawn. About an hour later he found that his right hand was swollen and painful. He complained of this to his superior officer and was set at other work, for the rest of the night. For three succeeding days his hand was dressed by the company surgeon, at whose suggestion he afterwards went to a hospital, where he stayed a week and then went home to his sick wife and then returned to the hospital and remained four weeks longer. He claims that his wrist has since been weakened so that he is unable to do some kinds of manual labor. He brought this suit against appellant to recover damages for this injury. Before he put his hand in the solution that night, he had cut or scratched it, and the declaration charged that his hand was cut and poisoned by reason of the negligence of

defendant, but in the proof there is nothing to show how he cut or scratched his hand or that appellant was in any way responsible therefor. The declaration charged that the contents of the galvanizing tank were poisonous to human flesh and that appellant knew it, and that appellant set plaintiff at that work without instructing or warning him as to the danger and without furnishing him any rubber gloves or other protection against this dangerous solution, and without any cover over the tank. Appellant pleaded not guilty. There was a jury trial and a verdict awarding appellee $300 as damages. Motions by appellant for a new trial and in arrest of judgment were denied and appellee had judgment, from which defendant below appeals. Appellee has filed a single typewritten brief, alleging the financial inability of appellee to present a brief in compliance with the rules. In said brief authorities are cited in support of the instructions, and it is asserted that the verdict was based on conflicting proof, and that the record contains no reversible error, and that the verdict should not be disturbed.

There is no proof that the solution in the electro-galvanizing tank was poisonous to human flesh, except the fact that after appellee had scratched or cut his hand in some way unknown to him, he placed his hand in the solution and an hour afterwards it began to swell and pained him and the hand became infected and supperation followed. He denied that he had ever had blood poisoning before, but the proof is clear that he had other scars, and that he told numerous witnesses that he had had blood poisoning before; and the attending surgeon testified that the inflamed condition did not yield readily to his treatment and he thereupon questioned appellee and learned from him that he had previously suffered from blood poisoning; and that he thereupon gave appellee alteratives and blood tonics and his condition rapidly improved. Appellee denied that he made those statements to the

surgeon and to various other witnesses. Appellant's proof showed that this tank was about 12 inches deep and 80 feet long and many wires passed through it at the same time, each wire through a separate mechanism, and that the speed of the wires was from 18 to 30 feet per minute; that the body of the solution was water, and that for each gallon of water there was approximately three pounds of sulphate of zinc and 1½ pounds of borax; that this solution, while sufficient for galvanizing, was not transparent, and that it was necessary that it be clear so that the reeler could watch the wires, and that to clear it about 5 cubic centimeters or about 5 small thimbles full of sulphuric acid were added to each gallon of this solution; and that this was the solution that was in this galvanizing tank at the time in question. The proof shows that the wires frequently broke while passing through the tank and that the reeler must then stop the mechanism which caused the movement and put his hands into the solution, draw the broken end of the rear wire forward to the other end and re-unite the wires, and that in doing this the reeler often every day must have his hands in the solution. There was proof by experts that this solution is not poisonous to human flesh and, indeed, that it prevents infection. There was proof by those who had long worked as reelers with this solution that they had their hands in it daily, and sometimes when their hands were cut or scratched, and never were poisoned thereby, but that if there was a cut or scratch, the solution would produce a slight smarting sensation. There was proof that, where from 9 to 20 men had been daily employed for several years as reelers handling the wire through this particular solution, no poisoning had ever resulted to any of the men therefrom, although no gloves or any other protection had ever been used by any one. The declaration complained that the tank was not covered. The first tank through which the wire passed was covered,

but at this place it was necessary that the tank, which stood about 36 inches above the ground, should be uncovered so that the course of the wires therein could be under constant observation by the reeler. Not having been favored with an argument by appellee, we cannot know what he might have said in support of this judgment on the facts, but as it appears to us from a perusal of the evidence in the abstract, there is a very strong preponderance of the evidence in the record that this solution was not poisonous to human flesh, and that the infection and blood poisoning from which appellee suffered was not caused by the solution or by appellant, and that he therefore had no cause of action against appellant. The judgment cannot be sustained under this evidence.

Some time after appellee had recovered he sought to get money from appellant. On April 22, 1909, appellant paid appellee $30 by a check and he executed and delivered to appellant an instrument. At the top thereof were the words "Settlement of injuries", printed in capital letters, and in red ink. Then followed these words in capital letters and in red ink: "Do not sign without understanding." Then followed the body of the instrument:

"For the sum of thirty dollars, paid to me this day by The American Steel and Wire Company of New Jersey, and for no other consideration or promise, I, Ernest Ohlmeyer, of 1301 Clement Street, Joliet, Illinois, have settled all claims I may or can have against the American Steel and Wire Company of New Jersey arising out of or in any way resulting from the injury suffered by me on or about the second day of March, 1909, while in said company's employ at its Rockdale works located in Joliet, Illinois.

Witness my hand, at Joliet, Illinois, this 22nd day of April, A. D. 1909."

Then followed in red ink these words: "Read before you sign." Appellee signed immediately underneath this, and Fred T. Jenkins and Ernest Harper

signed as witnesses. On the back thereof F. Ingraham and Fred T. Jenkins, under date of April 22, 1909, signed the following instrument:

"At the time of signing the within settlement agreement, Ernest Ohlmeyer stated to me that he had read the agreement, that he understood it, and that he was satisfied with the settlement."

The payment of the $30 and the execution by appellee of said writing in consideration thereof presents an absolute defense to this action, unless the same has been successfully assailed by appellee. This defense did not have to be set up by special plea, and could be given in evidence under the general issue. Papke v. Hammond Co., 192 Ill. 631, and cases there cited. In an action at law such a release cannot be avoided except by proving fraud in securing its execution, such as misreading it to the party signing it, or the surreptitious substitution of one paper for another, or some trick or fraud in procuring the signature, or where it is represented to a signer who is unable to read that the paper is of some other character or for some other purpose. The law upon that subject in this state is fully stated and illustrated in Hartley v. Chicago & Alton R. R. Co., 214 Ill. 78, and in the cases there cited. Ingraham was the superintendent of the mill. Appellee testified that before he left the hospital the last time he asked the company surgeon whether he thought Ingraham would give him some money to help pay his rent, which was about four months in arrears; that the surgeon told him to go to Ingraham and that he would talk with Ingraham over the phone; that he did see Ingraham, and Ingraham went into another room and talked with the surgeon over the 'phone, and then said he would have to write to Chicago first and find out; that at that first interview he asked Ingraham to let him have a little money, so that he could pay his rent, and that he was back four months at $10 per month; that later he went to Ingraham and Ingraham said he could pay him $30

and that would help him to pay his rent; that Ingraham handed him a piece of paper and told him to sign it and then called up the person who made out the checks and told him to bring him a check for $30, and he did; and that appellee signed the paper given him and that the person who brought the check and another party, who was brought in, signed as witnesses; that he took the check and left; that he did not remember whether he signed one or two papers; that he did not read the papers; that they were not read to him by anybody; and that he believed that he was signing a receipt that Ingraham gave him $30 to pay his rent.

Appellee was born in Iowa and attended school there till he was ten years old. He has always lived in Iowa or Illinois. He testified that he was accustomed to read newspapers, by which he apparently meant newspapers in the English language. He had been in several employments which made it necessary for him to read English, notably as a street car conductor, where he had to make out a report of each trip on a printed slip, to do which it was necessary that he be able to read the different printed lines thereon. He read aloud certain parts of this release on the cross-examination. He only claimed that there were large words in English which he could not read. He admitted that he could read the simpler parts of the English print. He claimed that he did not make any attempt to read the paper he signed. He testified that he had stated everything that was said at the interview when he signed this release. He did not state that he was told anything whatever concerning the contents of the paper. He did not testify that any misrepresentation whatever was made to him, he did not claim that he asked to have the paper read to him or that any one undertook to tell him the nature of the paper. He collected the wages due him when he left the plant the morning after he claims he was injured or during that day. When he asked the super-

intendent for $30 he knew there were no wages due him, and he must have understood that it was paid either as a mere gratuity or to settle something. It is manifest that under the above authorities there was nothing in his testimony to affect the validity of this release in this case. The evidence introduced by appellant on this subject shows by a clear preponderance that this $30 was paid to him in settlement for his injuries and that he so understood it. Ingraham became superintendent some two weeks after appellee was injured and had no personal knowledge of the matter. He testified that on April 19, appellee called at his office and told him that he had sustained an injury at the plant and asked if the company would pay him some money for the injury; that Ingraham replied that it was not customary to make settlements till the employe went back to work; that appellee said that he needed the money and would like to make a settlement then; that he told appellee to come back in a few days; that appellee returned on April 22, and he then told appellee that he would settle with him for $30; that appellee expressed himself satisfied, and Ingraham said: "We will make out a release and you can sign it;" and that the release and the check were prepared, and that appellee signed the release in the presence of Ingraham, Jenkins and Harper. Jenkins was the superintendent's clerk, and testified that he saw appellee sign the release and saw the check delivered to appellee, and heard appellee say that he understood the settlement and was satisfied with it. Harper was the chief clerk at the Rockdale plant and testified that he saw appellee sign the papers and saw the check for $30 given to him, and that after reading the documents himself appellee said he was satisfied, and on cross-examination he further testified that appellee held the release in a position as if he were reading it, and looked it over, and held it in that attitude long enough to have read it. We are of opin-

ion that, under this evidence introduced by appellant, the jury should have found that appellee executed the release with a full understanding of its purport; but that, even the testimony of appellee, when all read, did not tend to defeat the release; and that under the cases above cited, appellee is not entitled to recover.

The judgment is therefore reversed.

*Reversed.*

Finding of facts, to be incorporated in the judgment: We find that for a valuable consideration, then paid to him by appellant, appellee released the cause of action upon which he brought this suit; and that the negligence charged in the declaration is not established by the proof.